## Case No. 15,241.

### UNITED STATES v. GOURLAY.

[2 Wheeler, Cr. Cas. 102.]

Circuit Court, S. D. New York.　Sept., 1823.

FEDERAL COURTS—CRIMINAL JURISDICTION—MUR-
DER ON AMERICAN SHIP IN BAY OF CADIZ.

Quære, whether a United States court has ju-
risdiction to try a person who committed murder
on board an American merchant ship in the Bay
of Cadiz.

Dist. Atty. Tillotson and Mr Haines. for
the United States. ·

Van Wyck, Baldwin, Scott & Blunt. for
prisoner.

On Friday, the 10th of September, at 9
o'clock in the morning, commenced the trial
upon an indictment found at the present
term of the court against William Gourlay,
for murder. The following jurors were ex-
amined and sworn, viz.: Calvin W. Howe,
William Finch, Daniel Oakley, John S. Brad-
ford, Nathaniel Rathbone, Smith Lane, Dan-
iel Barnard, Samuel Maverick, Samuel Dixon,
Dennison Wood, Lyman Fitch, and John
Reid. The indictment was read, consisting
of three counts, of which the first charged
the offence to have been committed in a bay,
the second in a haven, and the third on the
high seas, near Cadiz, in the kingdom of
Spain.

Mr. Tillotson opened the case for the Unit-
ed States, and observed that he deemed it
proper to state explicitly, not only the facts
and circumstances attending the offence
which was charged, but also the law by
which those facts were to be governed. In
civil cases, questions of law were referred
to the court; but in criminal trials the jury
were made the judges as well of the law as
of the facts. In this case, the grand jury
had charged the prisoner with wilful mur-
der; and if the fact of the killing be proved
by the United States upon the prisoner, the
law would presume it to have been done with
malice. It would then rest upon the accused
to produce such circumstances of mitigation
as would reduce the crime from the highest
grade of homicide. He should expect, in or-
der to substantiate the charge, to show: 1st.
The killing; 2nd. That it was done by the
prisoner; and 3rdly. The facts, as he under-
stood, were briefly these:

That on the 14th of June last, the ship
Canton: was lying in the Bay of Cadiz, in an
open roadstead, where the sea was flowing
in, on board of which the offence charged
was perpetrated by the prisoner upon Wil-
liam Jones. The Canton was an American
ship, of which the master was then on shore;
the prisoner the first, and the deceased the
second mate. In the afternoon of that day
a quarrel had been sought, authority oppress-
ively exercised, and a blow given by the
prisoner. At the close of the evening, Jones
went into the berth assigned him by the cap-
tain, which was in a single stateroom, the
berths being placed the one over the other.
Gourlay came down, and ordered Jones out
of his berth. The latter refused, when Gour-
lay pulled off the clothes, and left him nak-
ed. Jones then jumped out, a struggle en-
sued. which continued until they got out of
the stateroom into the main cabin. Gourlay
then cried "Murder!" and an indentation ap-
peared from Jones' teeth. Jones, it would be
proved, was about 21 years of age, a humble.
tranquil, feeble young man; whilst the pris-
oner, as the jury would observe, was stout
and athletic. After they had been disen-
gaged from the struggle, Gourlay looked
steadfastly for some time at the deceased.
and then said, "By God! I'll shoot you,"
stepped back into his room, took his pistol;
levelled it, and shot him dead on the spot.
These were the facts. as Mr. Tillotson was
advised, and he presumed no effort would be
made to reduce the grade of the crime below
that of manslaughter. Mr. Tillotson then
cited various authorities to show from the
cases found in the books that the present
was not a case of manslaughter, but of mur-
der. Among them were 1 East, 233; Notes
to Chit. Cr. Law, and 3 Chit. Cr. Law, 730.
The prisoner was indicted under the 8th sec-
tion of the act of congress entitled "An act
for the punishment of certain crimes against
the United States," passed April 30, 1790 [1
Stat. 112]. That section declares: "That if
any person or persons shall commit, upon the
high seas, or in any river, haven, basin or
bay, out of the jurisdiction of any particu-
lar state, murder or robbery, or any other
offence, which, if committed within the body
of a county, would, by the laws of the Unit-
ed States, be punishable with death * * *
being thereof convicted, shall suffer death."
Should the jury, on the question of jurisdic-
tion, entertain doubts whether the United
States intended to punish murder in cases
like the present, he presumed the jury would
find the facts specially, so that the question
might be revised and finally determined by
the supreme court of the United States.
Such a course would be decorous and cor-
rect, and it would be peculiarly proper, inas-
much as a general verdict (the jury being
judges both of the law and the fact) would
be conclusive, and could never be revised.

Captain Charles M'Cauley was sworn on
the part of the prosecution. He commanded
the ship Canton on the 14th of June, but was
absent on shore at the time the affray hap-
pened. The ship lay about a mile from the
molehead in Cadiz, and about two and a half
miles from Fort Catalina, on the opposite
side, which is fortified and now occupied by
the French. It was far in from the chops of
the harbour. It is about seven and a half
miles from Rota to Cadiz, and about three
miles from Fort Catalina to the Fort Esca-
ronada (towards Rota), opposite Cadiz. The
water is about five or six fathom. All with-
in the point of Rota and the Fort St. Se-
bastian is called and occupied as the Bay of

Cadiz. The Canton did not approach nearer Cadiz on account of the shallowness of the water. She came to anchor, unloaded, and loaded in that place. In the winter such ships go farther in. It is the usual place for mooring such ships. Had just discharged the ship the day of the affair. The king of Spain entered Cadiz the next day after. The Canton was an American ship. Her owners were Americans.

Thomas M'Cready identified and proved the register of the ship Canton, and its American character.

Jacob Smith was a carpenter on board the ship Canton on the 14th of June, in the port of Cadiz. About sunset he put away his tools. A lighter was alongside the ship, with salt; and as the ship was short of hands, and wished to discharge the lighter, witness laid to and assisted in taking out the salt. A little past 9 o'clock witness missed the prisoner, by whom he was soon after called down into the cabin. Knew not what Gourlay wanted, but went down. Gourlay addressed him, and said, "Carpenter, I have brought you and Vesey and the steward down to witness that I order Mr. Jones out of the berth." Does not recollect he said this or that berth. Deceased was then lying in his own berth. Gourlay repeated the order to Jones to get out. Jones replied he would not go out alive; that, he said, was the place appointed by the captain for him to sleep, and there he would sleep. Prisoner turned round and said, "Carpenter, haul that man out of his berth." Witness refused, stating that he was willing to obey his orders, but unwilling to drag the man out of his berth, for he didn't know the consequence. Prisoner then pulled the bedclothes from Jones, seized and dragged him into the dining room, where they had a clinch together, and in passing the mahogany table they nearly capsized it in the scuffle. Witness put his hand on the table, and held it till they passed it. He went on deck, leaving them scuffling, and asked the men to go down and part the two mates, or they would kill each other. A man named Jones (not the deceased) said, "Let them fight; it's none of our business." Whilst receiving this answer, "Murder!" was cried in the cabin, in about a minute after witness left it. Witness went down, and prisoner held up his hand, and said, "This man has bit me." It was on the left hand; a slight wound, which bled a little; also a small wound on the cheek. Gourlay and deceased were then clinched, Jones being partly down on his knees, and Gourlay above him, and had the command of him. There was a little place on the side of Gourlay's cheek, and the blood running from his hand. Witness, with his right, laid hold of Gourlay by his left arm, and Jones with his other by the shoulder, and thus separated them. Jones was a small man, five feet three inches high. Knows his height, for he made his coffin. Begged Jones to go on deck. Deceased said: "Where shall I go? Am I to be murdered?" Witness told Jones

to go on deck, and sleep in Black's berth, in the forecastle. Black was then on shore. "You say you are going to leave the ship tomorrow. Gourlay (the prisoner) says he is going to leave the ship tomorrow. Go, and stay in the forecastle to-night. Gourlay is in a passion now, and in the morning, when the captain returns, all will be well." Jones was then standing with his back near the companion way, and the prisoner with his back to the stateroom door. They were about four feet apart, and the witness about four feet from them. Gourlay then said, "By God! I'll shoot you," stepped back a foot, reached back his arm, took down a brass pistol, cocked it, and shot him dead. Prisoner had two pistols, usually loaded, suspended over the berth where he slept. Witness took the candle, then standing on the table, looked upon Jones, and perceived he was dead; he did not stir; turned, and said, "Mr. Gourlay, you have killed the man." Gourlay replied: "I can't help it. He ought to have obeyed my orders." Witness, Wm. Vesey and George Brown were the only persons present at the time Jones was killed. The men on deck, hearing the report of a pistol, came below. They insisted upon prisoner's being immediately put in irons, and kept in that way until the captain returned in the morning. It was done, and he remained so until the morning, when, as soon as witness thought he could get into the city, he took a boat, went ashore, and found Capt. M'Cauley, to whom he related the facts. Captain M'Cauley, Captain O'Sullivan, the American deputy consul, and four Spanish soldiers came on board, took Gourlay ashore, took off his irons, and put him in prison in Cadiz, where he remained until the vessel was ready to sail. Witness supposes he was taken ashore by order of the deputy consul. In answer to questions by Mr. Tillotson, witness said he thought it was about two minutes from the time the struggle ended to the time that the pistol was fired and the deceased shot. In this time witness gave the advice stated, and prisoner moved along in the meantime to near the stateroom, where the pistol was. The wounds of the prisoner were one on his knuckles, and one on his cheek. Does not know whether either was a bite or not. The deceased had no weapon of any kind in his hand.

Mr. Blunt, for prisoner, requested that the other witnesses be removed while the witness was under examination. The court granted the request.

Witness continued. In the afternoon previous to the alleged murder, at four o'clock, the deceased had three or four men in the hold, trimming or stowing salt. Deceased could not please the prisoner, who quarreled with him in the hold, and called him a "damned worthless scoundrel." Deceased came on deck, said he would have nothing more to do with the ship, and would quit when the captain came on board. A few words passed, when prisoner struck the de-

ceased on the head. A scuffle ensued, and the parties were directly separated, and prisoner told witness to go below and get the irons, and put Jones in them. Witness went and got them, and came on deck, and found deceased with the cook's tormentors, or flesh fork, in his hands, and swore he would not be put in irons alive. Prisoner seized the deceased, to take away the instrument, but could not do it. Witness, by order, took hold of one end of it, but soon let go; thought he would let Gourlay get them away himself.

Gourlay then ordered Vesey to get the cutlass. Vesey got it. Gourlay received it, but soon afterwards put it away, saying: "I will not use such a thing against you." Prisoner then ordered a pair of pistols to be brought up. Vesey brought the pistols, and laid them down under the dripstone, aft of the companion. Did not know whether Gourlay knew the pistols were there. Prisoner succeeded in getting away the tormentors from deceased, and threw them overboard. From that time nothing further than words occurred until sundown. Had words after that. Jones was not put in irons. Deceased was shot under the left eye, near the nose. Died immediately. Did not move. Thinks the ball did not pass through the head.

Cross-examined by Messrs. Blunt and Scott: Witness had a little dispute with prisoner, but more with deceased. About three weeks previous he was about putting on the forehatch bar, and prisoner told him (witness) to go to hell, and struck him. Witness took up the handspike, but laid it down, and did not strike, an explanation having taken place.

Witness had always treated prisoner as a brother. Prisoner once took witness forward in a state of intoxication from the cabin. Witness was asleep, and didn't know whether he refused to go. It was some time before this affair,—three or four weeks,—while in Cadiz No illwill was entertained by witness against prisoner. He did not see the whole transaction. Went on deck and heard prisoner's voice cry "Murder!" and went down as before stated. Deceased did not strike prisoner in the eye previous to taking the pistol. Didn't notice that prisoner had a black eye. There was a black spot on his cheek. Does not know how it came. Saw the parties both looking at each other. The deceased was not in the attitude of fighting Deceased had nothing on but his shirt when dragged from his berth. Prisoner is an Englishman. Jones retired to his berth, refusing to do any more duty, while others were busy at work. Prisoner did not say, when he commanded Jones to leave his berth. "Come out, and do your duty;" but "Go out of this place; I am afraid of you." Prisoner expressed fear of his life if deceased remained there. Prisoner was quarrelsome, and deceased more so. The crew were busy at work three hours after deceased had quit labour. When the captain left the vessel his direction to prisoner was to get the salt aboard, that we might not be compelled to work on Sunday. It was then Saturday. It was not exactly an order, but he expressed it as his wish and expectation, and directed prisoner to give an extra glass of grog to get it finished. When prisoner said, "By God! I'll shoot you," deceased replied, "I can't help it." Witness was examined by the deputy consul, who is a Spaniard, and speaks broken English, and heard the examination read once or twice since his arrival here. He now speaks from recollection, and his testimony would be the same if he had not heard that examination read. He was examined on board the ship. No Spanish officer was present. He remembers the transaction perfectly well. Witness does recollect that prisoner ordered deceased to leave the cabin. After the cry of "Murder!" went down A little before he shot, he said "Get out of my sight."

William Vesey, a young man, apparently about 17 or 18 years of age, was next called. He was a mariner on board the Canton. Saw Gourlay, the prisoner, go into the cabin with a candle in his hand. It was about nine o'clock. Witness was in the cabin. Gourlay says: "Jones, come out of that cabin. You shall not sleep there to-night." Jones was then undressed, in his berth, where he had been, probably, about an hour. Gourlay added: "My life is not safe if you sleep there. Come out, and you shall have as good a bed as I have. But you shall not sleep under me, for my life is not safe." Deceased replied, "No, I'll not come out." Prisoner rejoined, "I'll make you." Prisoner then went on deck, called down the carpenter (Jacob Smith), the steward, and himself (Vesey), for witnesses, and said to us, "I call you down to be witnesses that I order Jones out of that berth." The prisoner then ordered him out again. Deceased replied he would not come out alive. Prisoner then directed the carpenter to lend a hand, who said, "No, he did not like to do that." Prisoner replied, "Then I must do it myself," and began pulling off the clothes, continuing to order deceased out. When prisoner had stripped the bed, deceased got up, and sat in the bed. Prisoner took him by the arm, and eased him out of berth. No violence was offered, and no resistance attempted. Both went into the cabin together. As they approached the cabin door, prisoner shoved deceased, but not so as to hurt him; and here they closed, and had a good deal of struggle. Prisoner cried "Murder!" and sung out: "O my God! he is biting me." The carpenter then rushed between, and parted them, begging deceased to go forward, and sleep in the forecastle. Deceased replied, "No;" he would not go forward, but would sleep in the place appointed by the captain. Jones then said: "What shall I do? Am I to be murdered?" This was just as they let go. Prisoner im-

mediately upon that said, "By God! I'll shoot him" (not "you," as Smith stated), addressing himself, as witness supposed, to the carpenter, and, in the act of saying so, made a rush to the door, squeezing himself through it sidewise into the stateroom. took the pistol from his berth, and shot the deceased through the half door; for the cabin door, being open, half shut the stateroom door. Deceased died immediately. Thinks the pistols were previously cocked, for witness often made up prisoner's bed, and found them cocked, and half-cocked them himself. Gourlay had a pair of pistols. Did not see the other pistol,—whether it was cocked or not. Witness was of the opinion that not more than fourteen seconds elapsed from the time the prisoner uttered the words, "By God! I'll shoot him," before he executed the deed. It was not more than a minute from the parting in the scuffle to the time of the shooting. Gourlay was standing still. and looking at Jones, whilst Jones said, "What am I to do? Am I to be murdered?" Prisoner appeared to be in a great rage. In the course of the afternoon, Jones said he would do no more duty until he had seen Captain M'Cauley. Gourlay said Jones did not do his work properly. Gourlay struck him in the face, but left no mark, nor did it stagger him. Deceased doubled his fist, and said to prisoner, "Look out!" Gourlay said to Jones, "Go on shore." Jones said he would if Gourlay would let him have a boat. Gourlay said he wouldn't give him a boat. Gourlay then said, "I will put you in irons," and ordered the carpenter to bring the irons up. Deceased declared he would not be put in irons alive. Prisoner replied, "Well, see if I don't," and ordered witness to bring him a cutlass, which he brought, and Gourlay laid it on the hatch. but did not use it. Jones made a rush. and got a pair of tormentors. Gourlay, seeing it, came up, and, after considerable struggle got them out of Jones' hands. and threw them overboard. This was about 5 or 6 o'clock in the evening. They then parted. Witness brought up two pistols to prisoner, shook out the priming on his way, and placed them under the dripping stone. Did not hear Gourlay order Jones to leave the cabin after the scuffle; he had not time. It was over like a flash of lightning. Jones was small. but pretty strong. Gourlay was then sick of the liver complaint. Has seen Jones clinch a larger man than himself. Captain did not assign any berth, but Jones usually slept in that he lay down in.

Cross-examined by Mr. Baldwin: Gourlay quarrelled with the cook because cook let Jones have the tormentors, and ordered witness to get pistols to intimidate the cook. Witness brought the pistols, but shook the priming out, for which Gourlay afterwards thanked witness. and said he had lived thus long without murdering any one, and should

be sorry to have that crime attached to his name. In the afternoon Gourlay said to the men, "Will you obey me?" They said, "Yes." He replied, "Then I order you not to obey that man," meaning Jones. The priming was knocked out before sundown. Gourlay took the pistols in the cabin with him, and probably primed them for the use of the ship again. Gourlay was mostly upon deck that afternoon and evening. He went down once to put on a shirt, his own being nearly torn off in one of the frays. The act of shooting was almost instantaneous after the separation. Gourlay's shirt collar was torn off.

George Brown, a black boy, who was steward on board the Canton, testified that Gourlay ordered Jones out of the berth. Jones refused. Gourlay then called for help, and the carpenter came. but refused to assist. Gourlay then took him out. They then struggled, and Jones bit Gourlay, and Gourlay called out "Murder!" and Jones let Gourlay go. Jones was biting Gourlay. Gourlay then stepped back, and said. "By God! I'll shoot you." Did not see the carpenter part them. They were struggling a couple of minutes. About a minute after separation, Gourlay shot Jones.

John Ray. The wound was on the left side of Jones' face, under the eye. Did not see the affray.

Here the prosecution rested. A recess of half an hour was given, when the prisoner's defence commenced.

Mr. Scott commenced the defence on the part of the prisoner, and occupied the floor nearly two hours. He adverted to the doctrine of homicide se defendendo; and although he did not place this case distinctly on that ground, yet he explained and enforced to the jury the authorities on that question, submitting to them whether a mutinous disobedience to the lawful authority of the prisoner, acting, in absence of the captain, as commander of the ship, would not justify his act. on the ground that he was authorized to use as much force as was requisite to carry into effect his lawful commands. 4 Bl. Comm. 183. Mr. Scott also insisted that the crime of which the prisoner was guilty at most was manslaughter, and not murder; and for this he cited the following authorities: 4 Bl. Comm. 193; 1 East, P. C. 224, 232; and Rowley's Case. and the case of the Scotch Soldier, 1 East, P. C. 252. He further contended that the court had no jurisdiction of the case. It was a crime, he said, committed in the harbor of Cadiz, within the jurisdiction and sovereignty of Spain; that sovereignty must, in its nature, be exclusive and absolute, and cannot be concurrent. He referred to and commented upon the following authorities: 1 Azuni, Mar. Law, 223, 233–235, art. 3; Hubner, p. 244; Vatt. Law Nat. 187, § 287. p. 236; U. S. v. Rice. 4 Wheat. [17 U. S.] 246; [Ex parte Bollman] 4 Cranch [8 U. S.] 136: s. p. Id. 144. 145: U. S. v. Palmer, 4 Wheat. [17 U. S.] 633; U. S. v. Ross [Case

No. 16,196]; U. S. v. Wiltberger, 3 Wheat. [16 U. S.] 94, 95.

Don Thomas Stoughton, the Spanish consul, was then called and sworn. He defined what he considered to be the Bay of Cadiz, and gave it as his opinion that the Spanish authorities had always exercised jurisdiction over the waters, not only where the Canton lay, but all that extent within a line drawn from Rota to the castle of St. Sebastians, the extreme point of the peninsula of Cadiz. Had never heard it doubted.

Hugh Roberts was born in Cadiz, and resided there many years. Considered the Bay of Cadiz less extensive than last witness. Supposed it to be included within a line from Fort Catalina direct to Cadiz. The position of the Canton would still be in it. The outer part of the bay from the line referred to, he considered as open road.

Captain M'Cauley was called again, and stated the instructions he had given prisoner to have the salt taken in that afternoon. Considered all the waters within a line from Rota to St. Sebastians as forming the harbor of Cadiz. Gourlay was taken on shore by the American deputy consul, assisted by the Spanish authorities. Knew of no refusal on the part of the Spanish authorities to take cognizance of the offence. Jones had served on board the ship but two or three days. Gourlay had been employed but a few days. Had perceived neither of them to be quarrelsome.

The testimony here closed on both sides, and Mr. Haines, associate counsel with the district attorney, stated the authorities to be adduced in support of the points of law which the prosecution would assume.

Mr. Van Wyck, in summing up for the prisoner, expressed a confidence that he would receive at the hands of the jury the same measure of justice as if he were one of our own citizens And the melancholy case before them he observed, exemplified the feeble hold we have on life. Neither the prisoner nor the deceased were aware that in so short a period the latter would be precipitated into eternity. Whether the agency of the prisoner in causing that event was the result of premeditated malice and a hardened heart, or whether it was produced by the impulse of sudden passion, was the momentous inquiry which the jury were called upon to try Had he been tried by the Spanish authorities, no jury would have interposed; and whether the circumstance of falling into the hands of the American consul may have been favorable to him or not, yet, if this court has not jurisdiction of the offence, the jury were bound on their oaths to acquit. If the Spanish government had cognizance of this case, this court has not. It would not do to say that, because the Spanish authorities did not try him, therefore we will. The jury were acting as agents of the government, and were bound to administer justice according to law. The several states of

the Union made a constitution, by which they delegated part of their sovereignty to congress. Whatever they did not impart, they retained •By the eighth section of the constitution authority was given to congress "to define and punish piracies and felonies committed on the high seas, and offences against the law of nations." To felonies committed on the high seas, and to none other. is this authority derived from the constitution to be applied. But the act of 1790, in conformity to which this indictment is drawn, would seem to have reference, not merely to the United States, but to all the rivers, havens, basins, and bays in the whole world. But congress can legislate only for those persons who owe allegiance to the United States. The construction contended for would make it assume a jurisdiction over the bays, rivers, and harbors of all Europe. Such cannot be the true construction of the act. If it were to be allowed, our jurisdiction would extend up the Thames, the Rhone, and the Danube. Our government could not have the hardihood to claim it. Our system of jurisprudence was derived from England, and by the law of that realm offences were to be punished in the place where they were committed. It is competent for congress to give construction to the term "high seas" in our own. but not in a foreign, country. If they have not power to pass laws to punish crimes committed in the territories of Spain. they have not power to invest a court with that authority. This was not a crime against the peace and dignity of the United States. but of Spain. The act of the consul does not confer jurisdiction on this court. There was no power in Spain, unless that specially of the king, which could surrender and transfer the prisoner from the jurisdiction of that country. And what a precedent would such a decision create! Suppose a felony be committed on board an American ship lying in the Thames The accused is entitled to the benefit of testimony; and what shall be done? The witnesses, many of them perhaps Englishmen, are to be taken on board and brought to New York to attend the trial. Thus the ships of the United States are to be freighted back with felons and witnesses. Suppose a British ship is at anchor in the harbor of New York, on board of which a homicide is committed upon a custom-house officer, would we not claim jurisdiction, and try the offence? Or suppose the reverse. that a custom-house officer had killed a British seaman, would we endure it that the offender, and all the witnesses to the act, should be transported to Great Britain for the trial of the accused? Or suppose, in the very case of the Canton, that the prisoner on board that ship, in the Bay of Cadiz, had killed, instead of William Jones, a Spanish grandee, or a custom-house officer of Spain, would the authorities of that country have suffered him to be taken to America for trial? The vice consul, it is true, assumed

the power or judge, jury, and police officer; but this assumption can give no jurisdiction to the court.

Mr. Van Wyck then commented ably and at large upon the facts as proved, which he contended did not make out the charge as set forth in the indictment.

Mr. Baldwin, on the same side, observed that there was certainly some difficulty in determining whether this case came under the jurisdiction of the court. It took place in the Bay of Cadiz, within the acknowledged jurisdiction of Spain; and to decide that it is subject to the authority of this court would necessarily involve the principle that a man may be tried twice for the one offence. This was abhorrent to our own laws and the laws of England. Piracy presents a different question. There, a first would be a bar to a second trial; for, it being a crime against all nations, each has the right to make its own laws to punish it. It will be objected that Great Britain assumes jurisdiction of offences committed on board her ships all over the world. But the parliament of Great Britain is said to be omnipotent. The constitution of the United States is limited, and we cannot follow their example. Mr. Baldwin adverted to the differences in the definition of the "high seas," as construed by the common law and admiralty courts, and contended that, however the construction might be in relation to them, yet the true intent and meaning of congress in the act referred to was that the high seas were those waters over which all nations had the right of passing, but neither had the exclusive jurisdiction; and that the words "havens, bays," &c., were meant to provide for cases wherein—like the river La Plata—the mouth is so wide that jurisdiction cannot be exercised from the shore, or bays, like those of Bengal, Biscay, or Honduras. Mr. Baldwin commented, at considerable length, upon the construction of the law as applied to the case, and adverted to U. S. v. Ross [Case No. 16,196]; Ross' Case, 5 Wheat. [18 U. S.] 200; and section 43 of Graydon's Digest, and concluded his remarks by an address to the jury upon the matters of fact in evidence.

Mr. Haines, on the part of the prosecution, contended for the positions which follow. Our limits preclude the illustrations and arguments by which they were enforced. He argued

(1) That the murder was committed on the high seas.

(2) That the 8th section of the statute of congress passed in 1790 clearly included the crime, even admitting that it was committed on the high seas

(3) That congress has the constitutional power to pass the law alluded to; and

(4) That the crime committed by the prisoner was murder, and not manslaughter.

Mr. Tillotson, Dist. Atty., concluded the argument in support of the prosecution, and confined his remarks principally to an exposition of the facts, and the grade of crime to which they necessarily pointed. His observations were perspicuous and liberal, and occupied the court until 11 o'clock in the evening.

Before THOMPSON, Circuit Justice, and VAN NESS, District Judge.

THOMPSON, Circuit Justice, then addressed the jury, and presented to them the law and the facts, in a very able and clear point of view. At half past 11 the jury were sent out, and returned at 1 o'clock on Saturday morning, with a special verdict: "Guilty of murder in the Bay of Cadiz." This verdict leaves the question of jurisdiction, which was an important point in the trial, open for revision. The judge stated that he was not clear upon the point, and suggested to the jury the verdict they gave, should they be satisfied that the crime in its nature amounted to murder. The cause will be carried up to the supreme court of the United States.